## ALDRICH v. CARGO OF 246⁵/₂₀ TONS OF EGG COAL.

(District Court, E. D. New York. June 17, 1902.)

1. SHIPPING—ACTION FOR FREIGHT—OFFSET.

> A canal boat laden with coal filled and sank, after reaching her dock, through leakage, and the negligence of her captain. The consignee, whose duty it was to discharge the cargo, did so after waiting two days, being put to additional expense because the boat was under water. *Held*, that he was justified in such action to save the cargo from further damage and possible loss, and was entitled to offset the increased cost of discharging against the carrier's claim for freight.

In Admiralty. Action to recover freight.

Hyland & Zabriskie, for libelant.

James J. Macklin, for claimant.

THOMAS, District Judge. The canal boat Annie E. Aldrich, laden with 246¼ tons of coal, crossed the Bay from Edgewater, N. J., and, by direction of the consignee's agent, took a berth on the north side of the pier at Bath Beach, on Friday, August 9, 1901, between 9 and 10 o'clock a. m. In the early part of Saturday night the vessel was found to be leaking, and sank between 3 and 4 o'clock on Sunday morning. The only person in attendance upon her was her captain. He was absent from her until about 11 o'clock on Friday night, and during that time had been drinking in the village of Bath Beach. During Saturday he was for the greater part of the time upon the boat, and claims that he tried her pumps not only on Saturday, but several times on Friday; that on both days he found that she had nine inches of water, although he stated that coming across the bay she had so little water that she did not need to be pumped. When he tried the pumps about 10 o'clock Saturday night, he found that she had 29 inches of water. Hence she was in such condition that she gained nearly two feet within an hour, and yet he had not discovered her condition until she was beyond aid.

Sunday morning the captain went to New York to report the condition of the boat to her owner, who, with his son, arrived at the boat about noontime, found her sunk, and remained till about 5 or 6 o'clock p. m. He states that her bow was under water, but that from her stern forward she was about two-thirds of the way out of water; that on Monday he notified the insurance company, and was authorized by it to procure a person to raise the boat, the work to begin on Tuesday; that on Tuesday he went down, and found that Henjes, the owner of the dock, and a stevedore, who was authorized so to do by McCollum, the consignee, had undertaken the discharge; that thereupon he notified the wrecker employed by Aldrich not to come, and left the work to Henjes. Henjes completed the discharge by noon on Wednesday, at which time he discovered that there was a leak on the starboard or offshore side of the boat, which he temporarily stopped. Thereafter the vessel was taken by Aldrich to a dry dock, where it was found that the bilge log on the under side and on the outer side was chafed and gouged over a considerable space; that in three places on the bottom planks were driven in,— all of which injuries were sufficient to admit water to the vessel.

The present action is against the consignee for the freight. To this claim for freight the consignee counterclaims the additional expense incurred in the employment of Henjes to discharge the cargo. The first question is, by whose fault did the canalboat sink? The libelant contends that there were small and large stones along the port or inshore side of the boat in the neighborhood of the injuries; that there was such a swell, and the water was so shallow, that the boat ground against such stones, and the leak resulted. The evidence on the part of the claimant is that there was sufficient water at the place where the boat lay; that it was one of the customary places for boats of her draft and of greater draft, and that no injuries had arisen to boats on former occasions, or had been caused since that time; and that there were no large stones on the bottom, although it was a place where cracked stone for macadamizing was from time to time unloaded. The evidence preponderatingly shows that, whatever stones there were on the bottom, there was sufficient water for the floating of vessels of her draft, but that, if she took bottom, the sharp stones were sufficient to produce the injuries to the vessel. Henjes testified that the captain told him that the boat drew six and a half feet. This the captain denies, and states that when the boat was fully loaded with 325 tons she would draw eight and a half feet, with one foot freeboard, but on the present occasion she had three and a half feet freeboard; that when he pumped on Friday or Saturday she had nine inches of water, but that he did not regard this as dangerous, and that he would not regard the water dangerous unless it were from four to five feet. He states that she did not have over three inches of water when she arrived at the dock, and he accounts for the nine inches of water that he found on Friday or Saturday by the alleged fact that water was shipped crossing the bay, and that she showed only three inches on arrival, because the water had not yet run through the coal. It is difficult to escape the conclusion that the boat was taking water after she ar-

rived and before she took bottom, and that the water gained sufficiently upon her to cause her to sink through the negligence of the captain in pumping her. His evidence and appearance upon the stand indicated that at that time, at least, he was not in a proper condition to take charge of the boat, and that he was negligent in his attention to her. The good condition of the bottom and the safety of the berth is illustrated by the former and subsequent use of the place by vessels of even greater draft, and it is equally well proved that there was no swell or action of the water that should have given her the violent motion attributed by the captain. The first conclusion is that the vessel leaked to some extent before she took bottom, and that she sank because the captain in charge allowed her to take too much water.

But it is urged that, inasmuch as the cargo was landed, the carrier should be allowed to recover his freight, and that the consignee may not offset against it the additional expense of discharge, caused by the negligence of the carrier's captain. It is undoubtedly true that if, after the sinking of a vessel, the carrier effects the completion of his duty and the delivery of the cargo, he may recover his freight; but if by carelessness of the carrier or the master the vessel is placed in such condition that the consignee is put to unusual disadvantage, and thereby additional expense in discharging her, the burden of such additional expense should not fall upon the consignee. The libelant's position is understood to be that, having notified the insurance company, and secured a wrecker at its instance, the consignee had no right to undertake the discharge of the vessel. Nevertheless the consignee acquiesced in Henjes' undertaking, and it is believed that the consignee, finding that the captain had left the boat on Sunday, and hearing nothing from him or from the owner by midday Monday, had a right to discharge the cargo, and that he was not obliged to wait either for his cargo, or the peril of its being further damaged, or possibly lost. All that he did was to discharge his cargo. But the libelant claims that the additional expense of discharging the cargo should fall upon the insurance company, and should not be deducted from the freight. The insurance company is not a party to the action. The libelant demands from the respondent compensation for transporting coal. The consignee answers that the carrier, by his negligence, brought the cargo under water, and added to the expense of the discharge, which was the consignee's duty. It is just to compel the carrier to pay the consignee such sum as will compensate for the additional burden placed upon the latter by the former's negligence. There may be some technical maritime rule that transcends the good sense that would ordinarily be applied to such a state of facts, but the decisions presented by the libelant do not seem to sustain this contention. The commissioner will ascertain the sum necessarily incurred by the consignee in discharging by reason of the libelant's negligence, and the same shall be deducted from the freight. If it exceed the freight due, the libel should be dismissed.